UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARGUERITE R. LEONARD,

        Civil Case No. 23-cv-12866

      Plaintiff,

v.                      HON. MARK A. GOLDSMITH

DANIEL DRISCOLL,

      Defendant.

_____/

## OPINION & ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 16)

Plaintiff Marguerite Leonard, a former civilian Army employee, filed this lawsuit alleging failure to accommodate, retaliation, hostile work environment, discrimination, and constructive discharge on the basis of sex and disability in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Rehabilitation Act, 29 U.S.C. § 794(a), against her former employer. Before the Court is Defendant Secretary of the Army Daniel Driscoll's motion for summary judgment (Dkt. 16). For the reasons that follow, the Court grants Driscoll's motion.[1]

## I.    BACKGROUND

Leonard was an intelligence analyst at the Army Tank Automotive and Armaments Command (TACOM). Leonard Dep. at 15–16 (Dkt. 16-2). Her primary job duty was to research intelligence and provide it to decision-makers. Id. at 16. This required her to access classified documents and maintain a top-secret security clearance. Id. at 19–20.

_____

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Leonard's response (Dkt. 18) and Driscoll's reply (Dkt. 19).

After the start of the COVID-19 pandemic, Leonard worked both on-site and at home, coming to the office at least once a week to access classified computers, which she was unable to do at home. Id. at 16–17, 20. In April 2021, Cary Deel became the acting intelligence supervisor and Leonard's direct supervisor. Id. at 19. Deel reported to Jim Rickard, the director of security and intelligence, also known as G-2. Id. at 18.

During the COVID-19 pandemic, Army employees were instructed to obtain approval from their supervisors before entering the workplace. 4/2/20 Email at PageID.266 (Dkt. 16-5). When Deel became Leonard's supervisor, he directed Leonard and all the employees under his supervision to "keep doing what you've been doing these past 12 months," including to "let me know who comes in," and "[i]f coming to the building, please notify me." 3/31/21 Email at PageID.271 (Dkt. 16-9); 4/9/21 Email at PageID.273 (Dkt. 16-10). Leonard does not dispute that employees were required to notify their supervisor before entering the workplace or that she failed to notify Deel before entering the workplace on April 7, 8, and 14, 2021. Leonard Dep. at 28–29, 35–39.

In February 2021 the Secretary of Defense implemented a policy requiring employees to wear masks at work except when alone in a room, briefly eating or drinking, lowering their masks for identification purposes, or if granted reasonable accommodation. Mask Policy at PageID.274 (Dkt. 16-11). This policy included TACOM G-2 employees. 2/28/21 Email at PageID.276–277 (Dkt. 16-12).

On April 7 and 14, 2021, Leonard was observed unmasked in the hallway. Deel Decl. ¶ 1 (Dkt. 16-13); Humphrey Aff. at ¶ 14 (Dkt. 16-14); 4/14/21 Email at PageID.302 (Dkt. 16-15). Leonard does not dispute this. Leonard Dep. at 46. She believes that she may have told Deel that she cannot wear a mask because of a "HIPPA issue" or a health issue. Id. at 42–43. She also

believes the conversation took place in May 2021 but could not recall what she actually said to Deel.  Id. at 41–44.  When Deel was discussing the mask requirement with Leonard, Leonard abruptly walked away.  Id. at 50–51.  Deel Decl. at ¶ 6.

On May 10, 2021, Deel proposed that Leonard be suspended for one day for (i) failure to comply with the requirement to wear a mask on April 7 and 14, (ii) failure to inform management that she was coming into work on multiple occasions, and (iii) discourtesy toward her supervisor. Leonard Dep. at 24, 27–28; Notice of Proposed Suspension at PageID.303–308 (Dkt. 16-16). Rickard deemed that each of these reasons in the proposed suspension were independently sufficient to justify a suspension.  Rickard Dep. at 47 (Dkt. 16-18).  Leonard does not take issue with being disciplined for failure to notify Deel before entering the workplace.  Leonard Dep. at 40–41.  She is not aware of any male employee who failed to comply with the mask requirement or failed to coordinate with Deel before entering the workplace.  EEO Dep. at 49–50.

Rickard wanted to schedule Leonard's one-day suspension for the day before her regular days off so that Leonard could have a long weekend rather than serve her suspension in the middle of the week.  Rickard Dep. at 44, 52.  Rickard intended to meet with Leonard to deliver notice of her suspension on July 7, 2021 in advance of serving her suspension the next day.  Deel Dep. at 119 (Dkt. 16-20).  However, Rickard had to reschedule the July 7 meeting to the next week and directed Leonard to serve her suspension on July 15, which happened to be the day of the female listening session.  Id. at 120.[2]  Rickard states that he did not intentionally schedule Leonard's

_____

[2] The female listening session was one of three "sensing sessions" scheduled for Tacom employees. Rickard Dep. at 50.  The goal of the session was to "take the pulse of the workforce," allowing employees to address any workplace concerns confidentially.  Id. The session was led by Lori Weiman, the Civilian Harassment Program Coordinator (CHIP).  EEO Dep. at 114; Weiman Decl. ¶¶ 1, 3 (Dkt. 16-19).  Participation in the sessions was voluntary; any employee unable to attend was offered an opportunity to meet individually with CHIP Coordinator Weiman.  Weiman Decl. at ¶ 1; Rickard Dep. at 52.

suspension for the day of the session. Rickard Dep. at 52. Leonard did not ask Rickard or Deel if she could serve her suspension on a different day or participate in the sensing session while serving her suspension. EEO Dep. at 122–124. Nevertheless, Leonard met with CHIP Coordinator Weiman and provided feedback about the work environment. Id. at 122; Weiman Decl. at ¶ 5. Leonard told Weiman about purported harassment, discrimination, and bullying she allegedly faced from Deel and Ricard. EEO Dep. at 129. Despite this meeting, Leonard testified that her "voice was stifled, eliminated, erased," as she was not "able . . . to support the other females in the G2." Id. at 29.

Leonard suffers from mitral valve prolapse, a cardiovascular issue that alone does not cause any issues for her. Id. at 25. But she says that as a result of that condition, she experiences shortness of breath, dizziness, lightheadedness, and irregular heartbeat when she is masked. Id. at 52–53. On August 8, 2021, Leonard submitted an accommodation request to Deel, requesting an exemption from the mask requirement. Deel Decl. ¶¶ 30-31; 8/8/21 Email at PageID.376 (Dkt. 16-21); Accommodation Request at PageID.377 (Dkt. 16-22). Deel emailed the request to the reasonable accommodation team and requested a meeting. Deel Decl. ¶ 32; 8/9/25 Email at PageID.379 (Dkt. 16-23). After consulting with the reasonable accommodation team, Deel asked Leonard to provide medical documentation to support her request for a mask exemption. Deel Decl. at ¶ 33; 8/10/21 Email at PageID.380 (Dkt. 16-24).

Leonard provided a doctor's note from her cardiologist, stating that Leonard has mitral valve prolapse and that Leonard should be "exempt from wearing a mask while at work as long as her COVID-19 vaccination is up to date." Doctor Note at PageID.381 (Dkt. 16-25) (emphasis added). The reasonable accommodation team then advised Deel to ask Leonard to provide her vaccination status given that Leonard's doctor conditioned the need for a mask exemption on her

being up to date on her vaccination.  Deel Decl. at ¶ 35; 8/20/21 Email at PageID.382 (Dkt. 16-26).

Deel asked Leonard to provide medical documentation of her vaccination status.  Deel Decl. at ¶¶ 36–37; Second 8/20/21 Email at PageID.383 (Dkt. 16-27).  Deel did not receive a response from Leonard, so he again asked her to provide her vaccination status and gave her a deadline to do so.  Deel Decl. at ¶¶ 36–37; 8/20/21 Email at PageID.382.  After the deadline had passed, Deel informed the accommodation team that Leonard had not provided her vaccination status; the team advised Deel to render a decision based on the information provided and recommended denial of the request due to inadequate supporting documentation.  9/3/21 & 9/7/21 Emails at PageID.386–387 (Dkt. 16-29).  Deel denied Leonard's request for a mask exemption because she failed to provide the necessary supporting documentation.  9/8/21 Email at PageID.389 (Dkt. 16-30).  Leonard is and was unvaccinated.  Leonard Dep. at 197–198.

Another of Leonard's job duties was to prepare and distribute the "Black Book," a monthly classified intelligence product, to leaders.  Deel Decl. at ¶ 44; Rickard Dep. at 14; Leonard Dep. at 54–55.  In June 2021, Deel directed Leonard to add headings in the Black Book for counterintelligence and to copy and paste under those headings finished counterintelligence content prepared by others.  Leonard Dep. at 55, 58–59; Deel Decl. at ¶¶ 44–45; 6/25/21 Email at PageID.390 (Dkt. 16-31).  The request to add counterintelligence to the Black Book did not originate with Deel; it came from "another division in the TACOM."  Rickard Dep. at 55–56.  Leonard refused to follow Deel's directive to add the requested content to the Black Book, insisting that the G-2 does not have a counterintelligence mission and that adding the content is prohibited.[3]

---

[3] Leonard cannot identify anyone who supports her view.  Leonard Dep. at 86.  Before Deel became supervisor, Leonard included counterintelligence in her Black Books contrary to her current

Leonard Dep. at 60.  Leonard and Deel exchanged emails about the directive; Deel repeatedly directed Leonard to add the requested content and Leonard repeatedly refused.  6/29/21 Email at PageID.391–392 (Dkt. 16-32); 7/27/21 Email at PageID.393 (Dkt. 16-33); Second 7/27/21 Email at PageID.394 (Dkt. 16-34); 7/28/21 Email at PageID.395 (Dkt. 16-35); Second 7/28/21 Email at PageID.396–397 (Dkt. 16-36); 7/29/21 Email at PageID.398 (Dkt. 16-37).  Deel then took the issue up the chain of command and consulted subject matter experts within the Army about Leonard's concerns.  Deel Decl. at ¶¶ 49–54, 57–65.  All of those consulted agreed that Deel's directive was lawful.  Id.

On September 15, 2021, at the recommendation of several intelligence officials, Deel directed Leonard to attend a classified meeting on September 21, 2021, to give Leonard an opportunity to discuss her concerns about the counterintelligence directive with a group of subject matter experts that had been assembled for that purpose.  Id. at ¶ 65; Leonard Dep. at 61–62; Calendar Invite at PageID.399 (Dkt. 16-38).  The meeting invitees included high-level Army personnel with intelligence expertise.  Deel Dep. at 102–106, 109–111.

Leonard read the meeting invite on the day it was sent and understood that she was required to attend.  Leonard Dep. at 62, 65–66.  She also recognized that there was high-level Army personnel invited to the meeting.  Id. at 64; Deel Dep. at 103–106, 109–111.  The purpose of the meeting was to "lay out [Leonard's] concerns with all the subject matter experts, the inspector general, intelligence oversight officers, the intelligence division chief, and the special agents that do counterintelligence activities," and to "have a professional conversation."  Deel Dep. at 106.

---

position.  Id. at 89–93 (This "was an oversight on my part," and "could have been" a violation of Army regulations.)

The day before the meeting, Deel reminded Leonard that her attendance at the meeting was required.  Leonard Dep. at 66–67; 9/20/21 Email at PageID.400 (Dkt. 16-39).

When the time for the meeting arrived, Leonard was not present for the scheduled start time and had not informed anyone that she would be late.  Leonard Dep. at 67–69.  Leonard says she was not on time because she was working on another assignment, revisions to the slides that she turned in a day earlier (fixing two minor typos).  Id. at 68–69, 71.  Leonard did not inform Deel that she felt that she had competing priorities or ask for his direction on which should take priority.  Id. at 71.

After Leonard failed to arrive on time, Deel left the meeting and walked to Leonard's office to ask her to join the meeting.  Deel Memo of Record ¶ 4 (Dkt. 16-40).  Leonard stated that she was working on the slides and Deel responded that everyone was waiting for her.  Id.  Deel returned to the meeting and shared Leonard's response with Rickard while apologizing to the attendees for the delay.  Id.  Rickard then left the meeting, walked to Leonard's office, and directed Leonard to join the meeting three times and told her that the slides could wait; Leonard still did not comply, and Rickard returned to the conference room alone.  Rickard Dep. at 64–65; Rickard Memo of Record ¶ 4 (Dkt. 16-41).  A third meeting attendee then got up to direct Leonard to attend the meeting, and Leonard finally arrived 15 minutes late.  Rickard Dep. at 65; Rickard Memo of Record ¶ 5.[4]

After introductions, Deel explained the purpose of the meeting and asked Leonard to share her concerns.  Deel Memo of Record ¶¶ 5-6.  Leonard responded that she did not request the meeting, did not know what it was about, and had nothing to say.  Id. at ¶ 6.  Deel attempted to

---

[4] Leonard admitted that she was late to the meeting, but she could not recall any of the events leading to her late arrival.  Leonard Dep. at 72–74.

provide an overview of Leonard's concerns and explained that the meeting was an opportunity for everyone to understand Leonard's perspective.  Id. at ¶ 7.  Leonard was "non-responsive and unwilling to professionally discuss the subjects."  Id.

As a result of Leonard's lack of participation, one of the meeting participants recommended ending the meeting.  Deel Memo of Record at ¶ 10.  Deel and Rickard agreed, and the meeting was adjourned.  Id.

Deel later described Leonard's behavior as "evasive and non-participative," "unprofessional," "showed an unwillingness to professionally engage or discuss any subjects," and "a professional embarrassment of the entire G-2 TACOM organization."  Id. at ¶¶ 8, 12.  Rickard wrote that Leonard's conduct "was not in keeping with the professional decorum expected of an intelligence professional" and "a waste of time" for the meeting participants.  Rickard Memo of Record at ¶ 12.

On November 1, 2021, Deel proposed that Leonard receive a five-day suspension for her unprofessional conduct before and during the September 21 meeting.  Notice of Proposed Suspension at PageID.403– 404 (Dkt. 16-41).  The notice included five specifications under each charge of unprofessional conduct.  The five specifications discuss Leonard's conduct leading to and during the September 21 meeting.  Id.  Leonard does not dispute that she engaged in the conduct outlined in the five specifications.  Leonard Dep. at 103–104.  Rickard accepted the suspension proposal.  Notification at PageID.411–413 (Dkt. 16-43).

On October 1, 2021, Leonard filed an EEO complaint based on sex and disability.  Complaint of Discrimination at PageID.414–416 (Dkt. 16-44).  After full discovery, including depositions, the EEOC granted summary judgment to the Army on all claims.  EEOC Decision at PageId.417–431 (Dkt. 16-45).

In November 2021, Deel rated Leonard "minimally successful" for the performance period of April 1 to September 30, 2021.  Performance Evaluation at PageID.437 (Dkt. 16-46).  Deel described Leonard as a low performing member of his team and observe that she repeatedly failed to follow directives from her chain of command.  Id.

On February 16, 2022, Leonard informed the Army that she would be retiring.  Leonard Dep at 227.  On August 30, 2022 Leonard requested to amend her EEO complaint to add a constructive discharge claim.  Memo at PageID.440 (Dkt. 16-47).  The EEOC denied her request as time- barred per 29 C.F.R. § 1614.105(a)(1).  Order at PageID.445–447 (Dkt. 16-47).

Leonard filed this lawsuit claiming that the Army discriminated against her, constructively discharged her, and harassed her because of her sex and disability, by taking the following actions: (i) denying her request for an accommodation seeking an exemption from mask requirements, Compl. at ¶¶ 68–69; (ii) requesting her vaccination status, id. at ¶¶ 11(b), 17(e); (iii) suspending her for one day "for failure to wear a mask," id. at ¶¶ 32, 49; (iv) scheduling her one-day suspension on the day of the female sensing session, id. at ¶¶ 50–51; (v) "repeatedly directing [her] to perform counterintelligence," id. at ¶¶ 83, 95; and (vi) suspending her for five days "for not performing counterintelligence," id. at ¶ 95.  Leonard also claims that her lowered performance rating and five-day suspension were retaliatory.[5]  Id. at ¶¶ 109, 111.  Driscoll moves for summary judgment on all counts.

## II.    ANALYSIS[6]

---

[5] Leonard does not recall Deel, Rickard, or any of her coworkers making any derogatory remarks about her sex or disability.  EEO Dep. at 133–134.

[6] In assessing whether a party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007).  If a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the Court will grant the motion. Fed. R. Civ. P. 56(a).  If the movant

Leonard brings her claims of not making reasonable accommodations, hostile work environment, sex and disability discrimination, retaliation, and constructive discharge under the Rehabilitation Act and Title VII, which prohibit discrimination on the basis of disability and sex, respectively.   29 U.S.C. § 794(a); 42 U.S.C. § 2000e–2(a)(1).   Driscoll argues that there is no genuine dispute as to any material fact regarding Leonard's claims and that they should be dismissed as a matter of law.

### A.      Accommodation Claim under the Rehabilitation Act of 1973

Leonard argues that the Army violated the Rehabilitation Act by denying her request for a reasonable accommodation exempting her from the Defense Department's masking requirement because of her cardiovascular condition.   Compl. at ¶¶ 61–64.

The Rehabilitation Act prohibits agencies from discriminating against any qualified individual with a disability.   29 U.S.C. § 794(a).   Discrimination includes "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability."   42 U.S.C. § 12112(b)(5)(A).

Driscoll argues that Leonard's discrimination claim should be denied because Leonard refused to provide her vaccination status, which Leonard's doctor conditioned his recommendation for a mask exemption upon.   "[E]mployers are entitled to medical documentation confirming the employee's . . . need for accommodation."   Tchankpa v. Ascena Retail Grp., Inc., 951 F.3d 805, 813 (6th Cir. 2020).   Leonard's doctor conditioned her need for a mask exemption on her being up to date on her COVID-19 vaccination.   Doctor Note at PageID.381.   To determine if a mask exemption was warranted, the Army needed to know if Leonard was current on her vaccination.

---

makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can only survive summary judgment by presenting evidence showing there is a genuine issue for trial.   Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

Leonard failed to provide this information despite multiple requests.   See 9/8/21 Email at

PageID.389.   Leonard was actually unvaccinated and did not meet the condition set by her doctor

for the requested accommodation.   Leonard Dep. at 197–198.   Leonard's accommodation claim

fails.   See Scaff v. Gap, Inc., 673 F. Supp. 3d 887, 902 (M.D. Tenn. 2023) ("An employee who

fails to provide the requested medical documentation cannot . . . claim that the defendant failed to

accommodate his request.").   The Court grants Driscoll's motion for summary judgment with

respect to Leonard's accommodation claim.

### B.      Hostile Work Environment Claim

To establish a violation of Title VII or the Rehabilitation Act, Leonard must prove that the

alleged discrimination based on sex or disability created a hostile or abusive work environment.

See Williams v. Gen. Motors Corp., 187 F.3d 553, 560 (6th Cir. 1999); Bryant v. McDonough, 72

F.4th 149, 151 (6th Cir. 2023).

To constitute a hostile work environment, the workplace must be "permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment."   Harris v.

Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (punctuation modified).   To establish a claim, Leonard

must prove: (i) she was a member of a protected class; (ii) she faced unwelcome harassment; (iii)

the harassment was based on sex or disability; (iv) the harassment was sufficiently severe or

pervasive to alter the conditions of her employment; and (v) the employer is liable.   Bryant, 72

F.4th at 151.

Leonard claims that the following acts constituted harassment: (i) denial of her

accommodation request; (ii) repeated inquiries into her vaccination status; (iii) her one-day

suspension; (iv) the scheduling of her one-day suspension on the day of the female sensing session;

(v) repeatedly directing her to "perform" counterintelligence; (vi) her five-day suspension; and (vii) her lower performance evaluation.

Only the repeated inquiries into Leonard's vaccination status and repeated directions for her to "perform" counterintelligence are potentially harassing acts that could support a hostile environment claim; the rest are discrete actions that are discussed in the next section.  See Ogbonna-McGruder v. Austin Peay State Univ., 91 F.4th 833, 840 (6th Cir. 2024) ("Allegations of discrete acts may be alleged as separate claims, and as such cannot properly be characterized as part of a continuing hostile work environment." (punctuation modified)).

Regarding the repeated requests for Leonard's vaccination status, Leonard's own doctor put Leonard's vaccination status at issue by conditioning Leonard's need for a mask exemption on her vaccination status.  Doctor Note at PageID.381.  The Army had "every right to require plaintiff to provide updated medical documentation to support her request."  Harvey v. Am.'s Collectibles Network, Inc., No. 3:09-CV-523, 2011 WL 182864, at *7 (E.D. Tenn. Jan. 20, 2011).  Moreover, the reasonable accommodation team, who is not alleged to harbor unlawful animus, advised Deel to seek Leonard's vaccination status.  Deel Decl. at ¶ 35; 8/10/21 Email at PageID.380.  Deel merely accepted the recommendation.  Nothing in the record suggests that sex or disability played any role in Deel's requests for Leonard's vaccination status.  Therefore, the requests for Leonard's vaccination status were not harassment.

 Regarding the directive requiring Leonard to add finished counterintelligence content to the Black Book, the idea to add the content did not even originate with Deel or Rickard, the only two individuals alleged to have discriminated against her; it originated in a different division.  Rickard Dep. at 55–56.  Moreover, it was not harassment for Deel to direct Leonard to do her job, even if Leonard disagreed.  See Clark v. Champion Nat'l Sec., Inc., 952 F.3d 570, 585 (5th Cir.

2020) ("A disagreement with an employer over terms of employment . . . do[es] not amount to harassment." (punctuation modified)).  Leonard must show that the counterintelligence directive was based on her sex or disability.  She cannot.  Leonard asserts that Deel's directive was sex-based because he did not include men on the directives.  Leonard Dep. at 130.  But Leonard admitted that the men may have already been including counterintelligence in their work products such that including men on Deel's directives to Leonard would have been unnecessary.  Id. at 130–132.  Leonard could not rule out the possibility that she was the only one to receive the directive because she was the only one not already doing it.  Id. ("I do not know what the men were doing.").  And the record shows that the men were already including counterintelligence in their work products.  Deel Decl. ¶¶ 82, 85–87; Humphrey Aff. ¶¶ 5, 8.

Leonard also cannot show that requiring her to add the challenged content to the Black Book is sufficiently severe or pervasive to alter the conditions of her employment.  Leonard must show that the directive was objectively severe or pervasive such that "a reasonable person" would find it hostile or abusive.  Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999).  Leonard cannot identify anyone who supports her view.  Leonard Dep. at 86.  Deel ran Leonard's concerns by experts; none agreed with Leonard's view.  Deel Decl. ¶¶ 49–54, 57–65.  Leonard failed to discuss her concerns with the group of experts that Deel assembled.  Deel Memo of Record ¶¶ 5–10.  While Leonard may hold a subjective belief that the directive was harassing, she cannot show that her belief is objectively reasonable, particularly when Leonard admitted that she previously did what she now claims is harassment.  See Leonard Dep. at 89–93.

The Court grants summary judgment regarding Leonard's hostile work environment claim.

C.      Sex and Disability Discrimination Claims

A plaintiff may prove discrimination under Title VII either by introducing direct evidence of discrimination or by providing circumstantial evidence supporting an inference of discrimination.  See Hardy v. Eastman Chem. Co., 50 F. App'x 739, 741 (6th Cir. 2002); Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997).  Direct evidence of discrimination is evidence that "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  White v. Columbus Metro. Hous. Auth., 429 F.3d 232, 238 (6th Cir. 2005) (punctuation modified).  If relying on indirect evidence, the plaintiff must show that: "(1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified [for the position], and (4) she was treated differently than similarly-situated . . . employee[s] [outside the protected class] for the same or similar conduct."  McClain v. NorthWest Cmty. Corr. Ctr. Jud. Corr. Bd., 440 F.3d 320, 332 (6th Cir. 2006).

If a plaintiff presents sufficient evidence to establish a prima facie case, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for the adverse action.  Id. at 332.  If so, the burden then shifts back to the plaintiff to "produce evidence from which a jury could find that [the defendant's] stated reason is merely pretextual."  Id. (citing Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981)).

Similarly, a disabled employee establishes prima facie discrimination if (i) she is disabled; (ii) she was qualified for her job; (iii) she suffered an adverse employment action; (iv) her employer knew about her disability; and (v) by showing similarly situated non-protected employees were treated more favorably.  Mitchell v. Toledo Hosp., 964 F2d 577, 582–583 (6th Cir 1992).

Leonard offers no direct evidence of disability or sex discrimination.  The parties, therefore, contest whether there is sufficient indirect evidence to make a prima facie showing of

14

discrimination.  Driscoll does not dispute that Leonard, as a disabled woman, is a member of protected classes covered under Title VII or the Rehabilitation Act or that she was qualified for her position.  <u>See</u> Resp. at 12.  The parties, however, disagree about the nature of the adverse employment action and whether Leonard was treated differently than males or non-disabled employees in a similar position.  <u>See</u> Def. Mot. at 19–21; Resp. to Mot. at 14.

The Court concludes that although Leonard's suspensions qualify as adverse employment action, she has failed to establish a prima facie case of disability or sex discrimination because she has offered no evidence of similarly-situated employees from non-protected classes who were treated differently.  Because Leonard has not established a prima facie case, the Court does not need to engage in the burden-shifting analysis or inquire into the possibility of pretext.  <u>Gantt v. Wilson Sporting Goods Co.</u>, 143 F.3d 1042, 1048 (6th Cir. 1998) ("Because [plaintiff] has not established a prima facie case of . . . discrimination . . . the court's analysis is over and there is no need to address the question of pretext.").

### 1.    Adverse Employment Action

Title VII does not set "a general civility code for the American workplace."  <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998).  An adverse employment action for the purposes of a Title VII discrimination claim requires conditions to be "intolerable" to a reasonable person, <u>Henry v. Lennox Indus., Inc.</u>, 768 F.2d 746, 752 n.3 (6th Cir. 1985), or requires a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998).

This is a higher standard than for a retaliation claim.  <u>See</u> <u>Rogers v. Henry Ford Health Sys.</u>, 897 F.3d 763, 776 (6th Cir. 2018) (noting that a showing of adverse action is "less

15

burdensome" in the retaliation context "than what a plaintiff must demonstrate for a Title VII discrimination claim"). "At a minimum, the employee must be able to show a quantitative or qualitative change in the terms of the conditions of employment." Deleon v. Kalamazoo Cnty. Rd. Comm'n, 739 F.3d 914, 919 (6th Cir. 2014). De minimis actions that are "mere inconvenience[s] or an alteration of job responsibilities" are not actionable. Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886 (6th Cir. 1996).

Leonard alleges two adverse employment actions: the one-day and the five-day suspension. But she fails to show how disability or sex played a role in either action.

Leonard's one- day suspension was for three different types of misconduct, which included: failure to wear a mask on two different occasions, failure to notify her supervisor before coming into the workplace on three occasions, and discourtesy. Leonard Dep. at 24, 27–28; Notice of Proposed Suspension at PageID.303–308. Rickard testified that any one of these categories of misconduct was sufficient to justify a suspension. Rickard Dep. at 47. Leonard does not dispute her underlying conduct and no longer takes issue with being disciplined for her repeated failure to notify her supervisor before entering the workplace. Leonard Dep at. 40–41. Because one independently sufficient aspect of the discipline is no longer challenged, the Court concludes that Leonard has not shown that the one-day suspension was discrimination. See Idemudia v. J.P. Morgan Chase, 434 F. App'x 495, 505 n.7 (6th Cir. 2011) ("When a defendant presents multiple legitimate, nondiscriminatory reasons for the [adverse] action, . . . the plaintiff must demonstrate that each independently sufficient reason is a pretext for illegal discrimination.").

As for the five-day suspension, Leonard suggests that it resulted from her refusal to "do counter-intelligence." Pl. Resp. at 8–9. However, the record shows that Leonard received the suspension for her unprofessional conduct leading up to and during the meeting regarding her

16

views on including counterintelligence in the Black Book.  Notice of Suspension PageID.405–406 (Dkt. 16-42).  Leonard does not contest that her conduct led to this suspension.  Leonard Dep. at 103–104.

### 2.  Treatment of Similarly Situated Employees Outside the Protected Classes

Leonard offers no evidence from which a reasonable juror could conclude that she was treated differently from similarly situated employees belonging to non-protected classes.  Title VII requires that a plaintiff demonstrate that she was treated differently than similarly situated, non-protected employees for the same or similar conduct.  Mitchell, 964 F.2d at 582–583.  This requires the plaintiff to not only specifically identify "comparator" employees with the same supervisors, experience level, and job responsibilities, but also to identify how the comparator employee was treated more favorably than the plaintiff that would give rise to an inference of discriminatory animus.  See Rodriguez v. Delta Airlines, Inc., 644 F. App'x 629, 634–635 (6th Cir. 2016); Gragg v. Somerset Tech. Coll., 373 F.3d 763, 767–768 (6th Cir. 2004) (noting that the "evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff" (punctuation modified)).  Here, Leonard offers no evidence that in receiving suspensions for her violation of workplace policy and unprofessional conduct she was "treated differently" than male or non-disabled employees who were similarly situated.

Regarding the one-day suspension, Leonard admitted that she is not aware of any employees who, like her, failed to comply with the mask requirement or failed to notify Deel before entering work.[7]  With regard to her five-day suspension, Leonard cannot offer a comparator who

---

[7] Leonard relies on testimony from Deel that he told male employees to "mask up" without issuing discipline.  Pl. Resp. at 7.  But Leonard failed to develop the record to identify these male employees or their supervisors, information needed for a comparator analysis.  Equally important, Leonard was disciplined for doing much more than failing to wear a mask on one occasion. Leonard has not identified a comparable who, like her, engaged in repeated types of misconduct

engaged in conduct similar to her conduct before and during the September 21 meeting.  Leonard cannot meet her burden to offer a comparator who was treated better than her with respect to either suspension.[8]

Because Leonard has offered no direct evidence implicating discrimination based on a protected class or indirect evidence that she was treated differently than similarly situated male or non-disabled employees for the same or similar conduct, Leonard has failed to make a prima facie showing of employment discrimination.  The Court thus rejects Leonard's sex and disability-based discrimination claim under Title VII and the Rehabilitation Act as a matter of law.

**D.     Retaliation Claim Under Title VII**

The Court next turns to Leonard's claim of retaliation.  To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: "(1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action."  Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007).

If a plaintiff presents sufficient evidence to establish a prima facie case, the "burden of production of evidence shifts to the [defendant] to articulate some legitimate, nondiscriminatory reason for its actions."  Morris v. Oldham Cnty. Fiscal Ct., 201 F.3d 784, 793 (6th Cir. 2000)

---

within a short time span.  See Wilbanks v. Ypsilanti Cmty. Sch., 742 F. App'x 84, 88 (6th Cir. 2018) (stating that a "single incident is not comparable to . . . two incidents within a period of a few weeks").

[8] To the extent Leonard argues that her lowered performance evaluation was discriminatory (as opposed to solely retaliatory), Leonard cannot offer a comparable employee outside her protected classes who engaged in similar performance issues and unprofessional conduct without receiving a lower performance evaluation.

(punctuation modified).  The burden then shifts back to the plaintiff to "demonstrate that the proffered reason was not the true reason for the employment decision."  Id. (punctuation modified).

The parties here have not thoroughly briefed this point.  Leonard has not specified a specific "protected activity" that would serve as the basis of her retaliation claim.  Driscoll does not suggest a "protected activity" either and only addressed whether there was a causal connection between Leonard's protected activity and the adverse employment action.  Def. Mot. at 24–25.  Leonard fails to make any arguments in support of her retaliation claim beyond her conclusory statement that "[f]or the same reasons and using the same evidence as outlined in her discrimination arguments, Plaintiff has produced evidence to support her claim of retaliation sufficiently to allow this case to proceed to a jury."  Pl. Resp. at 20.

While there is overlap between the discrimination and retaliation claims, they have distinct elements, and Leonard has not developed the distinct retaliation elements at all.  As such, she has forfeited any argument that these claims should survive summary judgment.  See Briggs v. Univ. of Detroit-Mercy, 22 F. Supp. 3d 798, 811 (E.D. Mich. 2014) ("If a party fails to respond to an argument raised in a motion the court can assume that opposition to the motion is waived and the motion may be granted.") (punctuation modified).  The Court grants summary judgment as a matter of law on Leonard's retaliation claim.

### E.    Constructive Discharge

Constructive discharge is "a tough row to hoe" and "hard to prove."  Groening v. Glen Lake Cmty. Sch., 884 F.3d 626, 630 (6th Cir. 2018).  "A constructive discharge occurs when working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  Tchankpa, 951 F.3d at 814 (punctuation modified). To prevail, work conditions must be "hellish, or at least close to it."  Id. at 815.  An

employee who quits "in apprehension that conditions may deteriorate later is not constructively discharged [because] the employee is obliged 'not to assume the worst, and not to jump to conclusions too fast.'"  Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002).  Moreover, "criticism and negative feedback do not suffice."  Tchankpa, 951 F.3d at 814.

Leonard must prove: "(1) the employer deliberately created working conditions that a reasonable person would perceive as intolerable, (2) the employer did so to force the employee to quit, and (3) the employee quit."  Cooper v. Dolgencorp, LLC, 93 F.4th 360, 373 (6th Cir. 2024) (punctuation modified).  "Whether a reasonable person would have fe[lt] compelled to resign depends on the facts of each case," but the Sixth Circuit considers the following factors:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

Logan v. Denny's, Inc., 259 F.3d 558, 569 (6th Cir. 2001) (punctuation modified).

Here, while she does not state it explicitly, Leonard's arguments are directed at the fifth factor, "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation."  See Pl. Resp. at 20–22.  The alleged badgering and harassment include: repeated requests for Plaintiff to mask and produce her proof of vaccination, a one-day suspension, requests to perform duties outside her mission, a five-day suspension, and a poor performance review.  Id.  However, Leonard has not alleged or presented any evidence that this behavior was undertaken with the specific intention of forcing her to quit.  Simply put, Leonard has not adduced sufficient evidence to show that the Army deliberately created intolerable working conditions with

the <u>intention</u> of forcing her to quit.  The Court grants summary judgment regarding Leonard's constructive discharge claim.[9]

### III.   CONCLUSION

For the reasons set forth above, the Court grants Driscoll's motion for summary judgment (Dkt. 16).

**SO ORDERED.**

Dated: September 29, 2025                      s/Mark A. Goldsmith
Detroit, Michigan                              MARK A. GOLDSMITH
                                               United States District Judge


### <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 29, 2025.

                                               s/Joseph Heacox
                                               JOSEPH HEACOX
                                               Case Manager

---

[9] Driscoll also asserts that Leonard's constructive discharge claim is time-barred.  Leonard does not take issue with Driscoll's position that the 45-day limitations period in 29 C.F.R. § 1614.105(a)(1) started running on February 16, 2022, when she informed the Army of her resignation.  The dispute concerns only when the clock stopped ticking, i.e., when Leonard initiated contact with an EEO counselor raising her constructive discharge claim.  The Army argued that it was on August 30, 2022, when Leonard sought to amend her EEO claim to include a constructive discharge claim.  Def. Mot. at 24.  Citing no authority, Leonard argues that it was earlier, on April 6, 2022, when she informed an EEO investigator of her decision to retire.  Pl. Resp. at 22–24.  The Court need not resolve the issue.  Even if Leonard's date is correct, she missed the 45-day window by two days.  Forty-five days from Wednesday, February 16, 2022, is Saturday, April 2, 2022.  Because the end date fell on a Saturday, Leonard's deadline was extended to Monday, April 4, 2022.  <u>See</u> 29 C.F.R. § 1614.604(g).  Thus, using April 6 as the date Leonard initiated contact with the EEO, as Leonard urges, the claim is untimely and may be dismissed on that basis.  <u>See, e.g.</u>, <u>Carter v. Greenspan</u>, 304 F. Supp. 2d 13, 22–24 (D.D.C. 2004) (dismissing case where plaintiff missed the 45-day deadline by four days).